**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| ENERCON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 2:18-cv-00258-GZS |
| | ) | |
| FLEXTRONICS INTERNATIONAL | ) | |
| USA, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are the Motion for Summary Judgment by Defendant Flextronics International USA, Inc. ("Flex") (ECF No. 47) and the Amended Motion for Summary Judgment by Plaintiff Enercon (ECF No. 49). As explained herein, the Court GRANTS IN PART and DENIES IN PART both Motions.

**I.    LEGAL STANDARD**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is 'one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party.'" Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). "A fact is 'material' if 'its existence or nonexistence has the potential to change the outcome of the suit.'" Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting Borges ex rel.

S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (internal quotation marks and ellipsis omitted); see also Fed. R. Civ. P. 56(e).  "Mere allegations, or conjecture unsupported in the record, are insufficient."  Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.").  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party."  In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side."  Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks omitted).

District of Maine Local Rule 56 prescribes a detailed process by which the parties are to place before the Court the "material facts . . . as to which the moving party contends there is no genuine issue . . . ."  D. Me. Loc. R. 56(b).  The Rule further requires each statement of material fact to be "followed by a citation to the specific page or paragraph of identified record material

supporting the assertion."  D. Me. Loc. R. 56(f).  Ultimately, in constructing the narrative of undisputed facts for purposes of summary judgment, the Court deems any statement with a supporting record citation admitted but "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment."  Id.; see also Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

The existence of cross-motions for summary judgment does not change the standard for construing the undisputed facts.  Rather, the Court is required to "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party."  Roman Catholic Bishop v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013).  In accordance with these standards, the Court constructs the undisputed material facts from the voluminous record in the following section.

## II.    FACTUAL BACKGROUND

Enercon is an electronics manufacturer, located in Gray, Maine, that provides personnel, material, equipment, services, and facilities to manufacture products for third-party original equipment manufacturers in accordance with detailed specifications provided by such parties. PVT Solar, Inc. ("PVT") was a subsidiary of SunEdison, Inc. ("SunEdison") that manufactured and sold solar energy equipment for residential installations.  Enercon designed and manufactured controllers used in PVT solar installations.

This relationship was governed by a Supply Agreement dated October 23, 2014, under which Enercon was the "Manufacturer," and PVT was the "Buyer."  (See Joint Ex. 1 (ECF No. 46-1) (the "Supply Agreement").)  The Supply Agreement reflected standard terms that Enercon

used with its customers.[1]  (See Joint Ex. 18 (ECF No. 46-19), PageID # 2659.)  The initial recitals

of the Supply Agreement explain:  Enercon "is willing to enter into a supply agreement and to

accept orders to manufacture [PVT]'s products upon terms and conditions, which, among other

things, reimburse [Enercon] for certain costs [Enercon] reasonably incurs in reliance on [PVT]'s

orders and forecasts but cannot recover because [PVT]'s requirements change."  (Id.)

Pursuant to the Supply Agreement, PVT would issue purchase orders for specific solar

component parts to be manufactured by Enercon.  In that regard, the Supply Agreement states:

> Orders. Performance under this Agreement shall be initiated by Orders issued by
> [PVT] and accepted by [Enercon]. [PVT] shall be under no obligation to purchase,
> and [Enercon] shall be under no obligation to manufacture, Products hereunder
> unless and until [PVT] issues an Order and [Enercon] has accepted [PVT]'s order.
> [PVT]'s Orders shall set forth for each ordered Product: (i) the quantity, which shall
> be not less than the applicable Minimum Order Size, (ii) the applicable Purchase
> Price and total price, (iii) the delivery and shipping instructions, and (iv) the
> requested delivery schedule, which shall comply with the delivery schedule
> limitations set forth in the applicable Product Schedule.  All Orders shall be subject
> to and governed by the terms and conditions of this Agreement and the applicable
> Product Schedules which shall not be changed or supplemented by an accepted
> Order unless such changed or supplemental terms and conditions are set forth on
> the face of the Order and specifically reference this Section 4.1.

(Supply Agreement, PageID # 958.)  Once an order was placed and accepted, Enercon would

purchase raw materials needed to fulfill the order.  PVT had the right to cancel or modify orders,

or defer shipments, subject to certain limitations:

> 4.3    Modification, Cancellation, or Deferment by Buyer. Orders may be
> modified or cancelled, and scheduled shipments may be deferred, only (i) upon
> Buyer's prior written notice and Manufacturer's written acknowledgement and (ii)
> upon terms, satisfactory to Manufacturer, that compensate Manufacturer for all
> costs incurred by reason of such modification, cancellation or deferment.
>
>> 4.3.1.   Cancellation. Prior to cancellation of any Orders, Buyer shall at a
>> minimum:
>>
>>> 4.3.1.1.        Purchase all Finished Goods Inventory related to
>>> Order.

---

[1] Notably, the Supply Agreement is governed by Maine law.  (Supply Agreement, PageID # 963.)

4.3.1.2.      Pay for all Work in Process and Raw Material inventory.  Manufacturer shall work with its suppliers to return Raw Materials wherever possible. In cases where materials can be returned, Buyer shall be responsible to pay for any supplier cancellation or re- stocking fees.

4.3.1.3.      Pay for materials related to the Order that are on-order with Manufacturer's suppliers. Manufacturer shall work with its suppliers to cancel orders wherever possible. If required, Buyer shall be responsible to pay for any supplier cancellation or re-stocking fees.

4.3.1.4.      Pay a cancellation fee to the Manufacturer of 15% of the remaining value of the Order.

4.3.2.  <u>Modification/Deferment</u>. Orders may be modified or deferred per this <u>Section 4.3</u>.

4.3.2.1.      Delivery of Products must be two-thrids [sic] complete within twelve (12) months of first delivery and fully complete within eighteen (18) months of first delivery. Any Order deferments that extend Product deliveries beyond eighteen (18) months may trigger a carrying cost of one percent of the Manufacturers Order inventory value per month.

(Supply Agreement, PageID # 959.)  A separate section required any amendment or modification to, or release from, an outstanding purchase order to be put in writing, signed by both parties, and specifically reference the Supply Agreement.

15.2.  <u>Written Modifications.</u> No amendment, modification or release from any provision of this Agreement, the Product Schedules attached hereto or Orders issued hereunder shall be of any force or effect unless it is in writing and signed by both parties hereto and specifically reefers [sic] to this Section 15.2.

(Supply Agreement, PageID # 959.)  Once product was shipped against an order, Enercon would invoice PVT or a SunEdison entity, as directed, for that order.

Between March 3, 2015, and January 22, 2016, PVT placed fourteen orders (the "Purchase

Orders") for Gateway 1.x controllers and related products.[2]  (See Joint Ex. 2 (ECF No. 46-2), PageID #s 968–82.)  While each purchase order listed an individual delivery date, none of the Purchase Orders had a delivery dates later than March 14, 2016.  To fill the Purchase Orders, Enercon purchased raw materials at an approximate cost of $2.3 million ("Enercon Purchased Inventory").  (See Joint Ex. 17, PageID # 2569.)

In September 2015, PVT inquired with Enercon about canceling the Purchase Orders.[3] Due to the costs involved with cancellation, PVT and Enercon engaged in negotiations regarding how to resolve the costs associated with the Enercon Purchased Inventory.  Between September 2015 and March 2016, there were no fewer than ten exchanges between PVT and Enercon seeking to resolve the Enercon Purchased Inventory issue related to the outstanding Purchase Orders. (Joint Ex. 18 (ECF No. 46-19), PageID #s 2713–26.)  In October 2015, Enercon sought a commitment from PVT, and stated that it "consider[ed] these purchase orders open until we achieve a resolution on [PVT's] request for cancellation." (Id., PageID # 2715.)

On October 16, 2015, Ryan Marcotte, Enercon's General Manager, summarized the issues involving the then-outstanding Purchase Orders as follows:

- A total of 24,012 gateways on eleven different orders are currently open: 17,484 of version 1.1 and 6,528 of version 1.3 (see attached "SunEdison Gateway Order Summary.xls" for details)

- Three of the eleven purchase orders have been analyzed for possible cancellation, totaling 6,000 version 1.1 and 1,920 version 1.3 gateways. The first-pass analysis and the resulting excess material list can be seen in the attachment "Gateway PO Cancellation Excess Analysis.xls".  We have requested from vendor any possibility for restocking/cancellation fee opportunities on these remaining items

---

[2] The Gateway controllers would permit a homeowner and PVT to monitor solar output.  The differing models (e.g., 1.1, 1.2, etc.) were a result of PVT's international markets, which included different voltage requirements in Europe. Flex later changed the name of this controller from "Gateway" to "Energy Hub 2."

[3] PVT had not previously sought to cancel any order with Enercon.  See Joint Ex. 18 (ECF No. 46-19), PageID # 2658–59.  The change coincided with a significant drop in price of SunEdison's stock.  See Joint Ex. 20 (ECF No. 46-21), PageID # 2845.

and should have that information shortly.

- For the other eight open purchase orders, the raw materials are either already here or in-route. The message from SunEdison at the time of the orders was that Enercon was behind schedule and that Enercon needed to do everything to improve delivery of Gateways – both US and EU. As a result, a number of the current on-hand raw materials were expedited at Enercon's expense to meet the crisis.

- A delivery schedule for the remaining balance of Gateways (less the three orders being analyzed for cancellation) was presented to SunEdison last Friday. This updated schedule gave delivery relief to SunEdison relative to the original purchase order request for weekly deliveries. It was discussed that this schedule has been loaded into Enercon's ERP system and deliveries will happen naturally to this schedule unless an alternate plan is agreed and implemented.

- Payment from SunEdison, and communication around payment, continues to be late and unreliable. Attached is a snapshot of AR aging as of yesterday, showing $576k of $1.1M receivables overdue.

  I appreciate your commitment to resolving this current situation, and to the creation of a framework that will prevent these issues moving forward. I look forward to having our call together early next week.

(Id., PageID # 2726.)

Communications regarding PVT's outstanding purchase orders and the related costs and inventory continued into 2016.  (See, e.g., id., PageID #s 2739–50.)  Then, on March 16, 2016, Joshua Plaisted, the then-Vice President of Product Development at SunEdison, sent a draft letter to Marcotte at Enercon stating:

Per your team's review with Mr. Veriah Pooniah [sic], this will leave the status of the non-returnable inventory as follows:

Non-returnable Inventory On-Hand    $2,370,536
Inventory allocated to Build of Gateway 2.0  $1,766,833
Inventory allocated to Build of 1,900 Gateway 1.x  $376,561
Un-allocated Inventory On-Hand        $227,142[4]

---

[4] This amount was subsequently further revised to $225,072.44 and then became the subject of PVT's 4/1/2016 Purchase Order PO218108 for "Enercon Excess Material."  Joint Ex. 20 (ECF No. 46-23), PageID # 2981–84.  At the time, Plaisted described the issuance of an entirely new purchase order for these materials—issued after the invoice for these materials—as a measure that would "keep it clean & simple."  Joint Ex. 18 (ECF No. 46-19), PageID # 2753.

(Joint Ex. 18 (ECF No. 46-19), PageID # 2752.)  Plaisted then laid out a process for Enercon to be paid for the Un-allocated Inventory.  (See id.)  This draft letter was ultimately finalized into a letter dated March 21, 2016, with a similar break down of non-returnable, excess inventory.  (See Joint Ex. 4 (ECF No. 46-4), PageID # 988 (the "Inventory Letter").)  Under this negotiated allocation, the parties contemplated that PVT would "consume" the bulk of the Inventory, valued at $2,143,394 (the "Remaining Purchased Inventory"), by having Enercon integrate the materials into the build of a newer Gateway model.  (Id.)  The final version of the Inventory Letter also added an acknowledgment that the total amount of Enercon Purchased Inventory constituted a "non-returnable liability of $2,370,536 . . . ."  (Id.)

## A.  The Bankruptcy

On April 21, 2016, before any of the Remaining Purchased Inventory was used, PVT, along with several other SunEdison entities, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York, with all cases being administratively consolidated in Case No. 16-10992 (the "Bankruptcy Case").  On April 29, 2016, Enercon filed a proof of claim in the Bankruptcy Case in the amount of $438,634.30 (the "Proof of Claim").[5]  (See Joint Ex. 8 (ECF No. 46-8), PageID # 1055.)  Enercon's Proof of Claim did not include the Remaining Purchased Inventory, but did include PVT Purchase Order PO218108 for $225,072.43, dated April 1, 2016, which reflected the Un-allocated Inventory On-Hand that PVT had agreed to pay in the Inventory Letter.[6]

---

[5] This Proof of Claim was based on seventeen different invoices Enercon had issued between January 19, 2016 and March 31, 2016.

[6] Notably, there was some follow-up communication between Plaisted and Marcotte regarding the un-invoiced Remaining Purchased Inventory after the Bankruptcy Case commenced.  On May 12, 2016, Plaisted sent Marcotte an e-mail (the "Critical Vendor E-Mail"), attaching a proposed "trade agreement" pursuant to which certain of the Debtors' critical vendors would be paid for pre-petition claims.  In the Critical Vendor E-mail, Plaisted stated that he was "working with the internal teams to put together a side letter that would ride in tandem with this to address the

On July 20, 2016, PVT filed a required schedule of its assets and liabilities as of the petition date, April 21, 2016.  PVT listed its total liability to Enercon as $398,454.31.  (Cummings Aff. Ex. A (ECF No. 54-4), PageID # 3354.)  The next day, the Debtors in the pending Bankruptcy Case, including PVT, filed a motion seeking approval of a private sale (the "Sale") of certain of its assets to Flex (the "Sale Motion").  The Supply Agreement was one of the assets to be included in the Sale.  The Sale was to be governed by an Asset Purchase Agreement dated July 21, 2016 (hereinafter, the "APA" (ECF No. 46-10)).

### B.  The APA

Pursuant to the APA, Flex was to purchase several specific assets from the Debtors for an aggregate purchase price of $8,700,000.[7]  The APA recitals describe the acquisition:

> WHEREAS, in connection with the Bankruptcy Cases and, upon the terms and subject to the conditions set forth in this Agreement and in the Sale Order . . ., each Seller wishes to sell, transfer, convey, assign and deliver to Buyer . . . and Buyer . . . wish[es] to purchase and acquire the Purchased Assets free and clear of all Liens, Claims, and Liabilities (other than Permitted Liens and Assumed Liabilities) (each as hereinafter defined), all in accordance with Sections 105, 363 and 365 and the other applicable provisions of the Bankruptcy Code (the "Purchase").

(APA, PageID # 1403.)  The Purchased Assets included specified "Assigned Contracts," which were to be assumed by SunEdison and then assigned to Flex "free and clear of all Liens, Claims and Liabilities (other than Permitted Liens and Assumed Liabilities)."  (Id., PageID # 1415.) Among the "Assigned Contracts" was the Supply Agreement.  (Id., PageID # 1564.)  With respect to Assigned Contracts, the APA states in relevant part:

---

excess material component." Joint Ex. 20 (ECF No. 46-23), PageID # 2988; see also Joint Ex. 20 (ECF No. 46-21), PageID # 2868.

[7] Prior to closing on the APA, Flex engaged in due diligence that was tracked on various spreadsheets.  See Joint Ex. 19, PageID #s 2819–23.  Among Flex's inquiries were the status of various supply agreements, inventory under those agreements, as well as the status and process for dealing with excess and obsolete inventory.  See id. at PageID #s 2794–95.  Despite all of these inquiries, SunEdison did not advise Flex about the existence of the Remaining Purchased Inventory or any outstanding liability related to this inventory.

2.3     Assumption of Liabilities.  Upon the terms and subject to the conditions set forth in the Agreement, Buyer agrees . . . to assume and shall agree to pay, perform and discharge when due, the following Liabilities (collectively, the "Assumed Liabilities") of Sellers:

....

(b)  all Liabilities in respect of the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Sellers on or prior to the Closing;

(Id., PageID # 1417.).  Liabilities[8] not expressly assumed in the APA were expressly excluded:

2.4     Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement, neither Buyer nor any Buyer Designee shall assume or in any way become liable for any Liabilities of any nature whatsoever (other than the Assumed Liabilities), whether accrued, absolute, contingent or otherwise, whether known or unknown, whether due or to become due, whether related to the Business or the Purchased Assets and whether disclosed on any schedule attached hereto, and regardless of when or by whom asserted (collectively referred to herein as the "Excluded Liabilities"), including the following:

....

(d) any Liabilities of any Seller . . . (ii) arising by reason of any breach or alleged breach by any Seller of any agreement, contract, lease, license, commitment, instrument, or Order, . . . ;

(e) any Liabilities of any Seller relating to any legal action, proceeding or claim arising out of or in connection with the conduct of the Business or any other conduct of any Seller or its officers, directors, employees, consultants, agents or advisors, in each case, on or prior to the Closing Date (other than the Assumed Liabilities and any Liabilities arising from or related to a breach or default by Buyer or any Buyer Designee of this Agreement or any other Transaction Document);

(f) any Indebtedness of any Seller;

. . . .

(k) any other Liabilities of any Seller not expressly assumed by Buyer or any Buyer Designees pursuant to Section 2.3.

(APA, PageID #s 1417–18.)

---

[8] This term was also expressly defined in the APA.  See APA, PageID # 1409.

The APA required that PVT and the other sellers set forth, "as reasonably determined in good faith," the applicable cure amount for each assigned contract. (APA, PageID # 1441.) Ultimately, the cure amounts were set forth by the Debtors in the Notice of Proposed Assumption, Assignment, and Cure Amount With Respect to Executory Contracts and Unexpired Leases Related to the Sale of the Global Channel Business and the Australia Business (the "Cure Notice"), which identified the Debtors' executory contracts and unexpired leases subject to potential assumption and assignment as well as the associated cure amount for each (the "Cure Amount"). (Joint Ex. 9 (ECF No. 46-9), PageID #s 1387–96). The Cure Amount listed for Enercon was $266,964. (Id., PageID # 1393.)

The Cure Notice provided that "any party or entity who fails to timely file and serve an objection to the proposed Cure Amount shall be (a) forever barred from objecting to the Cure Amount and from asserting any additional Cure Amount or other amounts with respect to the Contracts, and the Debtors and the Buyers shall be entitled to rely solely upon the Cure Amount listed on Schedule 1, and (b) forever barred and estopped from asserting or claiming against the Debtors or the Buyer that any additional amounts are due or other defaults exist." (Id., PageID # 1390.) The Cure Notice further provides that "parties seeking to object to the Debtors' assumption or assumption and assignment of any Contract listed in Schedule 1 must file and serve a written objection[] so that such objection is filed with the Court and is ***actually received*** no later than fourteen (14) calendar days after the date the Debtors served this Cure Notice . . ." (Id., PageID #s 1388–89.)

Enercon was served with the Sale Motion, which included the Cure Notice. Enercon did not object to the Sale Motion or the Cure Notice. In fact, other than filing its Proof of Claim, Enercon made no other filings in the Bankruptcy Case.

### C.  The Sale Order

On August 16, 2016, the Bankruptcy Court approved the Sale Motion, which, in relevant part, required payment of the Cure Amount to Enercon and assignment of the Supply Agreement to Flex.  (Joint Ex. 14 (ECF No. 46-14) (the "Sale Order").)  The Sale was completed and closed on or about September 6, 2016 (the "Closing").

In the Sale Order, the Bankruptcy Court found and determined that adequate and sufficient notice of the Sale was provided:

> As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Sale Hearing and the Sale Transaction has been provided in accordance with . . . the Bankruptcy Code and Bankruptcy Rules . . . The notices were good, sufficient and appropriate under the circumstances, provided all interested parties with timely and proper notice of the Sale Hearing and the Sale Transaction, and no further or other notice of the Sale Notice and the Sale Transaction is required.

(Sale Order, PageID # 1791.).  The Bankruptcy Court also found and determined that "Bankruptcy Code section 363(f) is satisfied because any party known to have asserted a lien, encumbrance, claim or other interest in any of Debtor Sellers' Purchased Assets were served with the Motion and received notice of the Sale Transaction and are therefore deemed to consent under Bankruptcy Code section 363(f)(2)."  (Sale Order, PageID # 1794.)

In the Sale Order, the Bankruptcy Court found and determined that the assumption and assignment of certain contracts, including the Supply Agreement "is integral to the [APA]" and payment of the Cure Amount is "the sole amount[] necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the . . . [Supply Agreement]." (Sale Order, PageID # 1795.)  Additionally, the Bankruptcy Court held that "[p]ursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Debtor Sellers' Purchased Assets, including but not limited to the Debtor Sellers'

Assigned Contracts shall be free and clear of any and all Encumbrances except for Assumed Liabilities and Permitted Liens."[9] (Sale Order, PageID # 1798.)  More specifically, the Sale Order stated:

> The Debtor Sellers are authorized to assume and assign each Assigned Contract to the Buyer, as described herein, pursuant to the terms of the Asset Purchase Agreement. The payment of the applicable Cure Amounts (if any) in accordance with the Asset Purchase Agreement shall (a) effect a cure of all defaults existing thereunder as of the Closing Date and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default. The Buyer shall then have assumed the Assigned Contract and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtor Sellers of such Assigned Contracts shall not be a default thereunder. Upon the payment of the relevant Cure Amounts in accordance with the Asset Purchase Agreement, neither the Debtor Sellers nor the Buyer shall have any further liabilities to the counterparties to the Assigned Contracts that accrue and become due and payable on or after the Closing Date except as provided in the Asset Purchase Agreement.

(Sale Order, PageID # 1801.)  Pursuant to the Sale Order, Flex was relieved from liability as follows:

> Upon payment of the applicable Cure Amount, if any, the Assigned Contracts will remain in full force and effect, and **no default shall exist under the Assigned Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.**

(Sale Order, PageID # 1802 (emphasis added).)

The Sale Order also bars and enjoins all counterparties "from raising or asserting against the Debtor Sellers or the Buyer any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing."  (Id., PageID # 1125.)

Under the APA, Flex was required to pay all Cure Amounts and deducted those amounts,

---

[9] The term "Encumbrances" is defined in the Sale Order to include: "any claim, charge, [or] lien . . . ."  (Sale Order, PageID # 1790.)

including the amount it paid to Enercon, from the Purchase Price it paid to the Debtors. (APA, PageID # 1422 ("Buyer shall pay . . . its respective amount of Assigned Contract Payables, provided that such amount was deducted in determining the Purchase Price . . . .).)  In accordance with these provisions, Flex paid Enercon the Cure Amount of $266,964 upon Closing.

After the Sale Order was approved, the Bankruptcy Court entered an order confirming a plan of reorganization (the "Plan") in the Bankruptcy Case.  (See Joint Ex. 15 (ECF No. 46-16).) Section 8.1 of the Plan provides:

> Rejection of Executory Contracts and Unexpired Leases.
>
> (a) Automatic Rejection. Except as otherwise provided herein, each **Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date**, unless any such Executory Contract or Unexpired Lease: (a) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1 of the Plan; (b) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume or reject pending as of the Effective Date; (d) is an Executory Contract related to any Intercompany Claim; or (e) is otherwise assumed pursuant to the terms herein.
>
> The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.

(Id., PageID # 2181 (emphasis added).)

### D. The Flex-Enercon Relationship Post-Sale

Flex placed the assets acquired from PVT, along with the PVT personnel it hired, into a new division called Flex Living.  Flex planned to establish its own residential solar business and

viewed the assets and personnel acquired via the APA as "an important starter kit." (Joint Ex. 19 (ECF No. 46-20), PageID # 2791.) At least seven SunEdison employees became employees of Flex under this arrangement, including Vikas Desai, Gokul Krishnan, Rajiv Radhakrishnan, Arthur LeBlanc, Veriah Poonnaiah, Charity Winsor, and Plaisted. Plaisted maintained the same title at Flex that he had at SunEdison: Vice President of Product Development.[10]

Various employees who moved from SunEdison to Flex, including Plaisted, Krishnan, and Poonnaiah, were aware that Enercon had $2.1 million in raw materials on hand that could not be returned.[11] They expected that these materials could be used by Flex to build controllers. However, while various individuals were aware of the Remaining Purchased Inventory, Flex did not become aware of this $2.1 million worth of components until after closing. (Joint Ex. 19, PageID # 2797.) Nonetheless, after the closing, Enercon began including the Remaining Purchased Inventory on quarterly reports provided to Flex. (See Joint Ex. 18 (ECF No. 46-19), PageID #s 2772–84 (email titled, "E&O Report 107-07-14").) In post-Closing communications to Enercon, Flex employees indicated that "Flex is committed to utiliz[ing] all [of] the inventory in Enercon['s] books." (Joint Ex. 20 (ECF No. 46-23), PageID # 3003.) Additionally, in December 2016, Flex put forward a proposal to use the bulk of the Remaining Purchased Inventory to build Energy Hub 2 units in exchange for some process changes and profit margin adjustments. (See Joint Ex. 20 (ECF No. 46-26), PageID #s 3076–88.) Almost a year later, in an October 27, 2017 communication to Flex, Marcotte indicated that the Flex inventory exposure totaled $2,277,544 and that "Enercon has been carrying the majority of the inventory for two years now." (Joint Ex.

---

[10] Similarly, Krishnan kept his Chief Operations Officer title at Flex and Poonnaiah remained the Senior Director Operations upon moving to Flex.

[11] See, e.g., Joint Ex. 18 (ECF No. 46-19), PageID #s 2743-47 (3/2/16 email from Marcotte to Poonnaiah & LeBlanc noting current Gateway materials of $2.3 million).

18 (ECF No. 46-19), PageID # 2786.)  Marcotte then asked for "a plan from Flex that outlines the eventual payment for this inventory." (Id.)  Despite the ongoing communications about the Remaining Purchased Inventory, Flex and Enercon did not finalize a written modification of the Supply Agreement, nor were any post-closing Orders placed under the Supply Agreement that sought to utilize the Remaining Purchased Inventory.  (See Supply Agreement, PageID # 963.)

Flex did issue three purchase orders under the Supply Agreement:  (1) PO300102, dated 6/1/2017, for $24,866.50, (2) PO300201, dated 11/22/2017, for $342,890.00, (3) PO300252, dated 1/29/2018, for $4,900.00.  (Joint Ex. 3 (ECF No. 46-4), PageID #s 984–86.)  Thereafter, by notice dated March 6, 2018, Flex terminated the Supply Agreement as part of a larger business decision to abandon its residential solar business.  In accordance with the terms of the Agreement, the termination became effective on July 6, 2018.  (See Supply Agreement, PageID # 958.)  The net amount Flex owes Enercon related to its own purchase orders is $75,584.14.[12]  (See Beaudoin Aff. Ex. A (ECF No. 49-3), Page ID # 3214.)

Enercon additionally maintained that Flex owes a total of $3,706,409.58 on the Remaining Purchased Inventory in connection with its termination of the Supply Agreement.  (See id.)  Thus, Enercon claimed total damages of $3,781,993.72.  On June 6, 2018, Enercon filed the pending Complaint for breach of contract in Maine Superior Court seeking to recover these damages.  On June 29, 2018, Flex removed the case to this Court.

---

[12] As calculated by Enercon CFO Marc Beaudoin this amount includes raw materials, cancellation fees, carrying costs and invoices for shipped goods, as well as a credit for a partial payment Flex made on PO300201.  See Beaudoin Aff. (ECF No. 49-2), PageID #s 3210-12.)

## III.   DISCUSSION

Plaintiff's Complaint frames its dispute with Defendant as a simple breach of the Supply Agreement.  Given the dueling motions, both sides maintain that this breach of contract claim is amenable to summary judgment.  In the Court's assessment, there are two separate time periods that must be examined to take stock of Plaintiff's claim: (1) the pre-termination, post-Closing time period in which Defendant was the Buyer under the Supply Agreement; and (2) the pre-Closing time period in which PVT was the Buyer.  As to each of these time periods, Plaintiff's claim requires the Court to determine whether a breach of the Supply Agreement occurred, Defendant's liability for the breach, and the damages for the breach.  The Court considers the latter, post-Closing time period first.

### A.   The Supply Agreement from September 6, 2016 through July 6, 2018

After assuming the role of Buyer under the Supply Agreement on September 6, 2016, Flex placed three accepted purchase orders for a total of $372,656.50.  Under the unambiguous terms of the Supply Agreement, Flex's termination, which became effective on July 6, 2018, did not "affect any obligations that exist as of the date of termination, including without limitation accepted Orders."  (Supply Agreement, PageID # 958.)  Thus, there is an apparent breach of the Supply Agreement by Defendant during this post-Closing period because it has not paid in full for these three purchase orders.

On the current record, it does not appear that there is a genuine dispute as to the damages owed for this breach.  Plaintiff has submitted a calculation of damages related to the three Flex-issued purchase orders showing total damages of $75,584.14.  (See Beaudoin Aff. Ex. A (ECF Nos. 49-2 & 49-3), Page ID # 3214.)  While Defendant maintained in its briefing that there were factual issues regarding any partial damage award, it ultimately admitted all of the facts that

underlie this damage calculation.  (See Def. Response (ECF No. 52), PageID #3529; Def. Response to Pl. SMF (ECF No. 51), PageID #s 3245–46.)  In short, the Court finds there is no trialworthy issues with respect to Plaintiff's claim for breach of contract as it relates to the three Flex-issued purchase orders.  Therefore, the Court GRANTS summary judgment in favor of Plaintiff to the extent that it alleged a breach of contract by Defendant in connection with the three post-Closing purchase orders and associated damages totaling $75,584.14.

### B.  The Supply Agreement Prior to September 6, 2016

Having addressed the simple breach of contract question queued up by the parties cross-motions, the Court turns to the complex question: if and to what extent is Flex liable for any breach of the Supply Agreement in connection with the Remaining Purchased Inventory?  The recitation of undisputed, material facts makes clear that this question cannot be answered by looking to the Supply Agreement alone.  Rather, the Sale Order and the APA play pivotal roles in answering this question.  Thus, the Court must consider the plain language of those documents as well as the process underlying those documents.

### 1.  The Impact of the Sale Order

The Debtors ultimately assumed and then assigned the Supply Agreement in accordance with the August 11, 2016 Sale Order entered in the Bankruptcy Case pursuant to 11 U.S.C. §§ 363 & 365.  "[11 U.S.C. § 365] generally allows the trustee in bankruptcy—or, as in this case, the debtor-in-possession—to assume or reject any pre-petition executory contract or unexpired lease, subject to the approval of the bankruptcy court."[13] Eagle Ins. Co. v. Bankvest Capital Corp. (In re Bankvest Capital Corp.), 360 F.3d 291, 295 (1st Cir. 2004).  "This latitude allows the debtor in

---

[13] "The Bankruptcy Code furnishes no express definition of an executory contract, but the legislative history of § 365(a) indicates that Congress intended the term to mean a contract on which performance remains due to some extent on both sides." Parkview Adventist Med. Ctr. v. United States, 842 F.3d 757, 763 n.12 (1st Cir. 2016) (internal quotations and citations omitted).

possession an opportunity to determine which of the prepetition executory contracts are beneficial to the estate and which should be assumed or rejected." Insite Corp. v. Walsh Constr. Co. P.R. (In re Insite Corp.), 906 F.3d 139, 143 n.2 (1st Cir. 2018) (quoting Mason v. FBI Distrib. Corp. (In re FBI Distrib. Corp.), 330 F.3d 36, 42 (1st Cir. 2003)).   "By permitting debtors to shed disadvantageous contracts but keep beneficial ones, § 365 advances one of the core purposes of the Bankruptcy Code: to give worthy debtors a fresh start." Eagle Ins. Co., 360 F.3d at 296 (internal quotation marks omitted).

11 U.S.C. § 363 allows for assumed contracts to be sold "free and clear of any interest," which is construed broadly. See, e.g., Solfisburg v. Glenco, Inc., No. 18-CV-10266-IT, 2019 WL 4770951, *7 (D. Mass. Sept. 30, 2019) (noting that courts "often construe what constitutes an 'interest' liberally").   The "free and clear" nature of asset sales under § 363 is often seen as "a critical inducement" to the sale. Massachusetts Dep't of Unemployment Assistance v. OPK Biotech, LLC (In re PBBPC, Inc.), 484 B.R. 860, 869 & 870   (1st Cir. B.A.P. 2013) (internal quotations and citations omitted).

At the same time, however, "the language of § 365(b)(1) is unequivocal." In re Superior Toy & Mfg. Co., 78 F.3d 1169, 1174 (7th Cir. 1996).  It provides "that if the debtor has defaulted on a contract prior to assumption, the debtor cannot assume [and, by extension, assign] that contract unless it (1) cures the default; (2) compensates the nondebtor party for any actual pecuniary losses resulting from the default; and (3) provides adequate assurance of future performance under the contract." Eagle Ins. Co., 360 F.3d at 296.

Here, it is undisputed that Enercon received the Cure Notice that warned Enercon that it would be "forever barred and estopped from asserting or claiming against the Debtors or the Buyer that any additional amounts are due or other defaults exist." (Sale Motion, PageID # 1390.)

Despite this warning, Enercon offered no objection to the Sale or PVT's proposed Cure Amount of $266,964, which did not account for the Remaining Purchased Inventory and was also below the amount in Enercon's proof of claim.  Generally, a party that opts not to challenge the terms under which the bankruptcy court authorizes the assumption and assignment of an executory contract does so at its own risk.  See F.D.I.C. v. Shearson-Am. Express, Inc., 996 F.2d 493, 498 (1st Cir. 1993) ("[o]rders, judgments and decrees of the bankruptcy court from which an appeal is not timely taken are final, even if erroneous") (internal citation omitted); see also In re Millivision, Inc., 328 B.R. 1, 6 (Bankr. D. Mass. 2005) ("When a [debtor-in-possession] seeks to assume a contract pursuant to 11 U.S.C. § 365, proof of the *amount* of any monetary default is the ultimate responsibility of the non-bankrupt party."); Concerto Software, Inc. v. Vitaquest Int'l, Inc., 290 B.R. 448, 453 (D. Me. 2003) ("If any party-in-interest is dissatisfied with the proposed cure, it is free to object to the debtor's motion to assume the executory contract.")

Plaintiff asserts that its failure to offer any objection to the proposed Cure Amount based on the Remaining Purchased Inventory reflects that PVT was not in default for the amounts associated with that inventory.  See, e.g., Federated Dep't Stores, Inc. v. Wongco (In re R.H. Macy & Co.), 236 B.R. 583, 591 (Bankr. S.D.N.Y. 1999) ("By its terms, section 365(b)(1) requires that the trustee cure present defaults, not defaults that are not yet in existence.  As it would be atypical for a trustee to include future obligations in the cure amount, if a trustee wanted to include contingent, unmatured debts in a cure prior to assumption, it would be incumbent on the trustee to state with some degree of clarity that these debts were to be included."); In re BK Racing, LLC, 2019 Bankr. LEXIS 457, *6 (Bankr. W.D.N.C. February 14, 2019) (debtor not in default at time of assignment because "[i]nvoice had not then been issued and would not become due and owing until" later date).  If the Remaining Purchased Inventory could be tied to an open purchase order

20

with a future delivery date or an open modified or deferred order, Plaintiff's position might have merit. However, on the undisputed facts presented here, the Remaining Purchased Inventory related to purchase orders that had essentially been cancelled in exchange for the negotiated Inventory Letter, in which PVT acknowledged its "non-returnable liability." (Joint Ex. 4, PageID # 988.) Given these facts, Defendant is correct that Enercon had an obligation to raise the liability associated with the Remaining Purchased Inventory as an objection to the Cure Notice.[14]  See, e.g., In re Cellnet Data Systems, Inc., 313 B.R. 604, 608–09 (Bankr. D. Del. 2004) ("Where the nonbankrupt party has knowledge of facts sufficient to place the party on notice that a 'potential' pre-confirmation breach has occurred, res judicata bars that party from later asserting a claim based on the pre-petition breach.")

Thus, the Court finds that Enercon's failure to object to the Cure Amount and bring forward PVT's liability for the Remaining Purchased Inventory forecloses Plaintiff's ability to seek damages for this amount based on Defendant's post-Closing termination of the Supply Agreement. Having accepted payment of the Cure Amount, Plaintiff is subject to the clear language of the Sale Order, which states: "Upon the payment of the relevant Cure Amounts in accordance with the Asset Purchase Agreement, neither the Debtor Sellers nor the Buyer shall have any further liabilities to the counterparties to the Assigned Contracts that accrue and become due and payable

---

[14] The parties' briefing and, in turn, the Court's analysis focuses on the lack of an Enercon objection to the cure amount based on the Remaining Purchased Inventory. However, given Enercon's position that Flex assumed the obligation to consume the Remaining Purchased Inventory upon assumption of the Supply Agreement, it is worth noting that Enercon also did not respond to the Cure Notice by seeking any assurance of Flex's future performance. Notably, Enercon acknowledges in its Response Brief that it had a coextensive right to object "to the adequacy of Flex's assurance of future performance under the contract" under 11 U.S.C. § 365(f). Pl. Response (ECF No. 53), PageID # 3268. However, as a non-debtor party notified of the pending sale and the terms of the APA, Enercon did not seek any such assurance. See, e.g., In re Fleming Companies, 499 F.3d 300, 308 (3rd Cir. 2007) (affirming the denial of an assignment under § 365 when the proposed assignee could not perform "a material and economically significant term").

on or after the Closing Date except as provided in the Asset Purchase Agreement." (Sale Order, PageID # 1124.)

## 2. The Impact of the APA

Given the Sale Order's exception of the APA, the Court looks to this agreement, which clearly limits Defendant's liabilities to "Assumed Liabilities." (Sale Order, PageID # 1118.) Section 2.3 of the APA provides an unambiguous definition of "Assumed Liabilities." (See APA, PageID # 1417.) Under that definition, Defendant can only be responsible for payments related to the Remaining Purchased Inventory if it was a liability "required to be performed after the Closing Date, [was] incurred in the ordinary course of business and [did] not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Sellers on or prior to the Closing," (Id.) While Plaintiff has pressed for a finding that the Remaining Purchased Inventory falls within this definition, the Court concludes that this tri-part definition of "Assumed Liabilities" presents multiple insurmountable hurdles for Plaintiff.

### a. Timing of Performance

First, the Remaining Purchased Inventory was clearly tied to accepted purchase orders that required builds and deliveries prior to the Closing Date, not after September 6, 2016. Viewed from this vantage, there can be no assumed liability from these purchase orders due to the timing of the required performance. The Court acknowledges Plaintiff's argument that the Remaining Purchased Inventory should be considered tied to the March 2016 Inventory Letter that reallocated the Remaining Purchased Inventory to contemplated future purchase orders that PVT impliedly promised via the Inventory Letter. With respect to the definition of "Assumed Liabilities," Enercon fares no better under this futuristic view. The Inventory Letter did not contain dates or prices for the future controller orders. Rather, in the absence of actual new purchase orders, the

Court concludes as a matter of law that the Inventory Letter did not *require* a performance after the Closing Date.  See, e.g., Smile, Inc. v. Moosehead Sanitary Dist., 649 A.2d 1103, 1105 (Me. 1994) ("Preliminary negotiations as to the terms of an agreement do not constitute a contract. . . . To establish a legally binding agreement between parties, the mutual assent to be bound by all its material terms must be reflected and manifested either expressly or impliedly in the contract and the contract must be sufficiently definite to enable a court to determine its exact meaning and fix any legal liability of the parties.") (internal citations omitted).

### b.  Ordinary Course of Business

Second, to the extent Plaintiff maintains that the Inventory Letter reflects a modification or an agreed-upon settlement for the cancellation of the purchase orders, it is apparent on the record presented that such liability was not incurred in the ordinary course of business, as required to be an "Assumed Liability."[15]  Considering the record before the Court, cancellations had not been an ordinary part of the Supply Agreement relationship.  Nonetheless, the Supply Agreement did provide a process for cancellation.  However, deviating from the ordinary course of business, Enercon and PVT sidestepped the cancellation process and converted only a small portion of the identified excess inventory to a new purchase order totaling $225,072.44. At best, the Remaining Purchased Inventory, totaling in excess of $2.1 million, was left essentially untethered to any

---

[15] Neither party has particularly attempted to define what it means for a liability to be incurred "in the ordinary course of business."  Albeit in another bankruptcy context concerning pre-petition transfers, the First Circuit has noted that "the hallmark of a payment in the ordinary course is *consistency with prior practice*."  Brandt v. Repco Printers & Lithographics (In re Healthco Int'l), 132 F.3d 104, 110 (1st Cir. 1997) (emphasis added).  Factors considered include "the amount transferred, the timing of the payment, the historic course of dealings between the debtor and the transferee, and the circumstances under which the transfer was effected."  Id. at 109.  By comparison, section 363 of the Bankruptcy Code states that a trustee "may use, sell, or lease" property of the estate without notice and a hearing if doing so is "in the ordinary course of business."  11 U.S.C. § 363(b)(1), (c)(1).  In this context, courts have looked variously to (1) "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry," Braunstein v. McCabe, 571 F.3d 108, 124–25 (1st Cir. 2009) (quoting In re Roth Am., Inc., 975 F.2d 949, 953 (3d Cir. 1993)); and (2) whether the transaction subjects a creditor to risk not impliedly agreed to when deciding to extend credit, the focus being "on the debtor's pre-petition business practices and conduct." Id.

existing purchase order with definite terms.  The Court necessarily acknowledges that the existence

of an outstanding purchase order that both sides expected to fill could be deemed a future liability

"incurred in the ordinary course of business" under the Supply Agreement.  However, on the record

presented, the Court concludes that any existing liability for the Remaining Purchased Inventory

was not incurred in the ordinary course of business under the Supply Agreement.[16]

### c.  Default or Breach Prior to Closing

Finally, to be an "Assumed Liability" the liability for the Remaining Purchased Inventory

must not relate to "a failure to perform, . . . . or other breach, default or violation by [PVT] on or

prior to Closing."  (APA, PageID # 1417.)  Similar to its explanation of its failure to object to the

Cure Amount, Plaintiff asserts that there was no breach associated with the Remaining Purchased

Inventory prior to Closing.  (See Pl. Response (ECF No. 53), PageID #s 3272–73.)  Defendant

disagrees and maintains that "PVT had refused delivery of the ordered goods and thus, Enercon

could have filed a suit against PVT for breach of the Purchase Orders" prior to PVT even filing its

Bankruptcy Case.  (Def. Response (ECF No. 52), PageID # 3255.)

Under Maine law, "the breach of a contract is cognizable when a party to the contract fails

to provide the bargained-for benefit."  York County v. PropertyInfo Corporation, Inc., 200 A.3d

803, 807–08 (Me. 2019) (citing Kasu Corp. v. Blake, Hall & Sprague, Inc., 582 A.2d 978, 980

(Me. 1990)).  It is undisputed that the Remaining Purchased Inventory was purchased by Enercon

in response to, and in order to fulfill, purchase orders that it had accepted from PVT.  The Supply

Agreement provides multiple avenues for PVT to have performed its obligations under those

purchase orders: (1) it could accept delivery of conforming goods and paid the associated invoice;

---

[16] In reaching this conclusion, the Court has also weighed the fact that the Inventory Letter and the existence of the Remaining Purchased Inventory was never disclosed as part of the due diligence undertaken for the APA.  In the Court's view, if this liability was incurred in the ordinary course of business, it should have been readily discoverable during the due diligence process.

(2) it could cancel the purchase orders and pay the fees required under Section 4.3.1 of the Supply Agreement; or (3) it could modify or defer the purchase order subject to an added carrying cost calculated in accordance with Section 4.3.2 of the Supply Agreement.[17]

Viewing the record in the light most favorable to Plaintiff, Enercon maintains that the Inventory Letter amounted to a modification thereby avoiding a breach. Yet in light of the unambiguous terms of the Supply Agreement, any attempted modification embodied in the Inventory Letter did not meet the mark. Under Section 15.2 of the Supply Agreement, no modification to an Order "shall be of any force or effect unless it is in writing and signed by both parties" and specifically references Section 15.2. (Supply Agreement, PageID # 963.) Similarly, under Section 4.3, a modification also requires a written acknowledgment by the Manufacturer and an agreement to terms acceptable to the Manufacturer. (See id., PageID # 959.) Nothing complying with either Section is in the record. Rather, the Court has only the Inventory Letter, which is ambiguous with respect to key details as to the Remaining Purchased Inventory. Among those ambiguities, what would happen to the Remaining Purchased Inventory if the contemplated orders to consume this Inventory were never placed? Given this ambiguity and the entire record, it is equally plausible that a factfinder would conclude that PVT's pre-Closing conduct amounted to a failure to perform or at least a partial breach of the Supply Agreement.[18]

---

[17] The Court notes that the Supply Agreement is unambiguous and neither side has suggested that the Supply Agreement should be deemed ambiguous. "[W]here the language is unambiguous, contract interpretation is a question of law for the court." Tate & Lyle Ingredients Americas, Inc. v. Transport Distribution, LLC, 746 F. Supp. 2d 189, 195 (D. Me. 2010).

[18] As noted in Defendant's briefing, PVT's conduct might also be viewed as an anticipatory repudiation. See Def. Mot. (ECF No. 47), PageID # 3107 ("[E]ven if there was not a prior breach by PVT, the [Inventory] Letter . . . is at the very least an anticipatory repudiation of the Purchase Orders . . .") & PageID # 3104 ("PVT also made it clear that the vast majority of the Purchase Orders would never be filled. As a result, Enercon had a claim for breach of contract against PVT prior to the bankruptcy . . . .") "Under Maine law, 'an anticipatory repudiation of a contract is a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives.'" Roger Edwards, LLC v. Fiddes & Sons, Ltd., 387 F.3d 90, 95 (1st Cir. 2004) (quoting Wholesale Sand & Gravel v. Decker, 630 A.2d 710, 711 (Me. 1993)) (internal quotation marks omitted). Between its initial cancellation request and its promulgation of the March 2016 Inventory

In a similar vein, the Court acknowledges the parties' genuine dispute regarding whether the Supply Agreement and the individual purchase orders should be deemed a divisible contract. For its part, Defendant insists that if the Supply Agreement and PVT's purchase orders are divisible from one another, it is apparent that "the purchase orders were neither assumed by PVT nor assigned to Flex." (Def. Mot. (ECF No. 47), PageID # 3113.)  However, under Maine law, "[t]he intent of the parties and the expectation of performance are crucial to determining whether a single contract or separate contracts exist."  Me. Farmers Exch. v. Farm Credit of Me., 789 A.2d 85, 89–90 (Me. 2002); see also Carvel Co. v. Spencer Press, Inc., 708 A.2d 1033, 1035 (Me. 1998).  While the Court concludes that the severability question is immaterial, it additionally notes that the issue is not amenable to summary judgment on the record presented given the fact-intensive and intent-focused nature of the inquiry.

However, while there may be a trialworthy question on this issue of whether PVT's conduct amounted to a pre-Closing material breach, the Court concludes that Plaintiff cannot avoid summary judgment in favor of Defendant on the issue of Defendant's pre-Closing liability.  As the Court noted at the outset, there are three elements built into the APA's definition of "Assumed Liability."  The Court has found that the timing of performance element and the "ordinary course of business" element are not met.  Thus, the Court is still satisfied that the undisputed facts amply

---

Letter, PVT arguably manifested its intention not to perform on the open purchase orders.  Furthermore, in the Inventory Letter, PVT was clear that it would not perform unless the orders were modified.  On the record presented, the Court concludes that whether PVT's conduct that gave rise to the Remaining Purchased Inventory constituted an anticipatory breach is similarly trialworthy.  See Drinkwater v. Patten Realty Corp., 563 A.2d 772, 776 (Me. 1989) ("[A] request or demand to modify a contract does not by itself constitute a repudiation unless the party seeking the modification threatens a total breach of the contract.")

support a finding that the Remaining Purchased Inventory was not an "Assumed Liability" under the APA.[19]

Simply put, liability for the Remaining Purchased Inventory was not expressly assumed by Flex and the Sale Order extinguished any liability that might have passed to Flex.  As a result, the Court finds that Defendant is entitled to summary judgment to the extent the pending claim for breach of contract sought damages for any pre-Closing breach that resulted in damages to Enercon.

## IV.    CONCLUSION

For the reasons just given, the Court hereby GRANTS IN PART AND DENIES IN PART both Defendant's Motion for Summary Judgment (ECF No. 47) and Plaintiff's Amended Motion for Summary Judgment (ECF No. 49).

Judgment on the claim for breach of contract shall enter in favor of Plaintiff with a total damage award of $75,584.14, with interest as allowed by law.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 30th day of November, 2020.

[19] A necessary corollary of the Court's conclusion that the Remaining Purchased Inventory is not an Assumed Liability under the APA is that the Inventory falls under the APA's unambiguous definition of "Excluded Liabilities" in Section 2.4 of the APA.  (See APA, PageID # 1417.)